## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 24-cv-23745-ALTMAN

COMMODITY FUTURES
TRADING COMMISSION,

     *Plaintiff*,

v.

TRADERS DOMAIN FX LTD. *d/b/a*,
THE TRADERS DOMAIN, *et al.*,

     *Defendants*.

_____/

Kelly M. Crawford, as Receiver of        ANCILLARY CASE NO. _____
TRADERS DOMAIN FX LTD. *d/b/a*,
TRADERS DOMAIN, *et al.*,,

       Plaintiff,

v.

ALIXSTAIR BURTON,
ALEJANDRO IMAR CALDERIN,
TIFFANY JONES-EVANS, and
ALEXIS ROMANO, individually, and
in her capacity as trustee of AR FAMILY
SPENDTHRIFT TRUST and ROMANO
FAMILY SPENDTHRIFT TRUST,

       Defendants.

_____/

## COMPLAINT

Court-appointed Receiver, Kelly M. Crawford, Esq. (the "Receiver") in the above-captioned enforcement action, files this Complaint against Defendants Alixstair Burton, Alejandro Imar Calderin, Tiffany Jones-Evans, and Alexis Romano,

individually, and in her capacity as trustee of the AR Family Spendthrift Trust and the Romano Family Spendthrift Trust (collectively, "Defendants"), and states:

## PROCEDURAL HISTORY

1.     On September 30, 2024, the CFTC filed a Complaint for Injunctive Relief and Demand for Jury Trial (the "Complaint") against Traders Domain FX LTD. d/b/a/ The Traders Domain; Ares Global Ltd. d/b/a/ Trubluefx; Fredrick Teddy Joseph Safranko a/k/a Ted Safranko; David William Negus-Romvari; Algo Capital LLC; Algo FX Capital Advisor, LLC, n/k/a Quant5 Advisor, LLC; Robert Collazo, Jr.; Juan Herman a/k/a JJ Herman; John Fortini; Steven Likos; Michael Shannon Sims; Holton Buggs, Jr.; Centurion Capital Group, Inc.; Alejandro Santiesteban a/k/a Alex Santi; Gabriel Beltran; and Archie Rice (collectively, the "Receivership Defendants"), commencing the above-captioned enforcement action (the "CFTC Action"). ECF No. 1.

2.     On October 3, 2024, the Court entered an Order granting the CFTC's Motion for Statutory Restraining Order, Appointment of a Temporary Receiver, and Other Equitable Relief  (the "SRO"). ECF No. 10.  The SRO was continued in effect pursuant to preliminary injunctions entered as to each of the Defendants (collectively, the "PI Orders").  ECF Nos. 38, 40, 41, 42, 48, 49, 53, 131, 144, 158.

3.     The Receiver's mandate was to, *inter alia*, take possession, custody and control of all the Receivership Defendants' assets, establish control of the entity Receivership Defendants' businesses (to the extent they exist and continue to operate), prevent the withdrawal or misapplication of the Receivership Defendants'

funds, collect funds due to the Receivership Defendants, obtain documents and records pertaining to the Receivership Defendants' assets, transactions and business operations, and perform all acts necessary to preserve the value of the Receivership Estate. *See* SRO.

4. The Receiver was also authorized to initiate, defend, compromise, adjust, intervene in, dispose of, or become a party to any actions or proceedings the Receiver deems necessary and advisable to preserve or increase the value of the Receivership Estate. *Id.* at ¶ 30(h).

## THE PARTIES

### The Receiver

5. Plaintiff, Kelly M. Crawford, was appointed by the Court as Receiver over the Receivership Defendants in the CFTC Action. Plaintiff brings this action in his capacity as Receiver, pursuant to the authority granted by this Court in the SRO and each of the PI Orders entered in the CFTC Action.

### The Defendants

6. At all material times, Defendant, Alixstair Burton was a resident of Atlanta, Georgia.

7. At all material times, Defendant, Alejandro Imar Calderin was a resident of Miami, Florida.

8. At all material times, Defendant, Tiffany Jones-Evans was a resident of Chicago, Illinois.

9.     At all material times, Defendant, Alexis Romano was a resident of Sarasota, Florida.

10.     Upon information and belief, Romano was a trustee and beneficiary of the AR Family Spendthrift Trust and the Romano Family Spendthrift Trust.

11.     Upon information and belief, Romano is closely associated with Receivership Defendants, Michael Sims and Algo Capital, LLC.

## JURISDICTION AND VENUE

12.     This action is related to the claims in the CFTC Action, over which this Court has original jurisdiction pursuant to Title 28, U.S.C., Section 1331, in that this action forms "part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). Pursuant to the principles of ancillary jurisdiction or supplemental jurisdiction, this Court has supplemental jurisdiction over the claims set forth herein pursuant to Title 28, United States Code, Section 1367(a). As such, this Court has subject matter jurisdiction over this action.

13.     Plaintiff was appointed as Receiver in this District and the instant Complaint is brought to accomplish the objectives of the SRO and PI Orders.

14.     "Courts have long recognized a federal court's supplemental jurisdiction over actions related to a receivership established in federal court." *See Mandel v. Howard*, 2012 U.S. Dist. LEXIS 43948 (S.D. Fla. Mar. 28, 2012) (collecting cases). This Court has subject-matter jurisdiction over the state-law claims asserted in this complaint in this ancillary proceeding pursuant to 28 U.S.C. §§ 754, 1367 because such claims are ancillary to the CFTC Action brought in the case captioned *CFTC v.*

*Traders Domain FX Ltd. d/b/a, The Traders Domain, et al.*, Case No.. 24-cv-23745-ALTMAN (S.D. Fla.), over which the court in the Southern District of Florida has jurisdiction pursuant to 28 U.S.C. § 1331. Jurisdiction extends from the Southern District of Florida to any judicial district where receivership property is found.

15.     This action is properly before this Court under the Court's ancillary jurisdiction because the Receiver brings this action to recover fraudulent transfers and for unjust enrichment relating to money transfers to Defendants made by the operator of a Ponzi scheme to exercise his obligations under the SRO. The CFTC Action is within the jurisdiction of the federal court in the Southern District of Florida under 28 U.S.C. § 1331 and this ancillary proceeding is in furtherance of the Receiver's duties under the SRO entered in the CFTC Action.

16.     The Receiver was appointed in the CFTC Action to accomplish the ends sought and directed by that action, and, as such, he may proceed under this Court's ancillary jurisdiction on claims with no other independent basis for federal jurisdiction. The Receiver, in this action, sues Defendants, each of whom or which received money transfers from the subject fraudulent scheme, which is a well-recognized use of the ancillary jurisdiction of the federal courts. *See e.g., Scholes v. Lehmann*, 56 F.3d 750, 753 (7th Cir. 1995) (finding federal ancillary jurisdiction over state law fraudulent transfer claims in an action by a receiver against transferees in a Ponzi scheme case).

17.     The Court has personal jurisdiction over Defendants because Defendants conducted business with, and/or received funds or transfers of assets from

the Receivership Defendants, which were operating, conducting, engaging in, and carrying on a fraudulent business or business venture in, among other locations, the Southern District of Florida. The transfers that Defendants received from Receivership Defendants were proceeds from Receivership Defendants' fraudulent scheme conducted from the Southern District of Florida.

18.     The Court also has personal jurisdiction over Defendants because they regularly conduct business in the state of Florida. Further, the Defendants solicited funds from Receivership Defendants in the state of Florida, and transacted business with Receivership Defendants in this District. In doing so, each Defendant purposefully directed its activities to the state and availed itself of the privileges of conducting activities in the state.

19.     Venue is proper in the Southern District of Florida pursuant to Title 28, United States Code, Sections 754 and 1692, because this action is brought to accomplish the objectives of the SRO and PI Orders and is thus ancillary to the Court's exclusive jurisdiction over the Receivership Estate. Further, the Transfers described in this Complaint were made from, and other acts described herein, occurred in the Southern District of Florida, and some victims of the scheme were located in the Southern District of Florida.

20.     All conditions precedent to the bringing of this action have been performed, waived, satisfied, or have otherwise occurred.

## RECEIVER'S STANDING

21.   The Receiver has standing to bring the claims asserted in this Complaint pursuant to the SRO. ECF No. 10 at ¶ 30(h). The SRO authorizes and empowers the Receiver to:

> Initiate…or become a party to any actions or proceedings…that the Temporary Receiver deems necessary and advisable to preserve the value of the Receivership or that the Temporary Receiver deems necessary and advisable to carry out the Temporary Receiver's mandate under this Order

*Id*. Included among such actions are fraudulent transfer and unjust enrichment actions to recover for the benefit of the Estate amounts that the Receivership Defendants fraudulently transferred to and/or unjustly enriched third parties.

22.   The Receiver as a "creditor," and on behalf of the "creditors," of Receivership Defendants, has standing to bring the fraudulent transfer claims asserted in this Complaint under the Florida Uniform Fraudulent Transfer Act ("FUFTA"), section 726.101, Florida Statutes *et seq*. and common law unjust enrichment (pled in the alternative to the fraudulent transfer claims).

23.   The Receiver also has standing to bring the fraudulent transfer and unjust enrichment claims on behalf of the Receivership Defendants as a creditor of pre-receivership Receivership Defendants seeking to redress the wrongs committed to the Receivership Defendants by its management in making the fraudulent transfers and unjust payments to and for the benefit of Defendants. *See Wiand v. Lee*, 753 F. 3d 1194, 1202 (11th Cir. 2014).

24.     Finally, the Receiver has standing to bring this action pursuant to 28 U.S.C. § 754, which provides that "[a] receiver appointed in any civil action or proceeding involving property, real, personal or mixed, situated in different districts shall . . . be vested with complete jurisdiction and control of all such property with the right to take possession thereof [and] shall have capacity to sue in any district without ancillary appointment[.]" As set forth above, the Receiver has complied with the requirements set forth in 28 U.S.C. §§ 754 and 1692.

### LIMITATIONS PERIOD AND APPLICABLE LAW

25.     This action is brought within the pertinent statutory limitations period. Section 726.110 of FUFTA provides a four-year period to seek to avoid and recover transfers from the date the transfer was made or, if later, within one year after the transfer was or could reasonably have been discovered by the claimant.

26.     Upon his appointment in October 3, 2024, the Receiver immediately began collecting financial documents including bank statements, wire transfer details, cancelled checks and business records for the Receivership Defendants. Many of the documents were obtained by subpoena from the Receivership Defendants' various banks. The Receiver then promptly forwarded those documents to his forensic accountants who conducted a forensic accounting analysis of the transfers that the Receivership Defendants made to third parties. The Receiver obtained and reviewed that forensic analysis and gained knowledge of Receivership Defendants' transfers to third parties therefrom.

27.     The Receiver did not and could not have discovered the facts constituting the Receivership Defendants' misconduct and the Transfers detailed below until after his appointment as Receiver in the CFTC Action on October 3, 2024.

28.     The Receiver seeks to avoid and recover constructive fraudulent transfers under section 726.105(1)(b) of FUFTA that were made to Defendants within the four-year period prior to the date upon which the Receiver filed this Complaint.

29.     The Receiver also seeks damages for unjust enrichment under Florida common law for the transfers made to Defendants within the four-year period prior to the date upon which the Receiver filed this Complaint.

## FACTUAL ALLEGATIONS

### The Traders Domain Fraudulent Scheme

30.     Traders Domain FX LTD. d/b/a The Traders Domain is a company with its principal operations in Canada. Fredirick Teddy Joseph Safranko a/ka Ted Safranko and David William Negus-Romvari were the control persons of Traders Domain FX LTD.

31.     From at least November 2019 to October 2024 (the "Relevant Period"), Traders Domain FX LTD fraudulently solicited at least 2,046 U.S. customers to deposit at least $283 million for the purpose of pooled trading of leveraged or margined gold-to-U.S. dollar pair ("XAU/USD") transactions (the "TD Pool").

32.     Traders Domain FX LTD solicited customers directly and by engaging other individuals and entities ("Sponsors") to solicit customers on its behalf in

exchange for commissions equivalent to a percentage, sometimes as high as 50%, of customers' purported trading profits.

33.     During the relevant period, Traders Domain FX LTD made false statements and fraudulent misrepresentations to prospective customers regarding its trading operations and the ability of customers to withdraw their funds. Traders Domain FX LTD misled customers into believing that all their deposited funds were being invested in XAU/USD when in fact customer funds were being misappropriated and used for other purposes.

34.     To conceal their fraud, Traders Domain FX LTD falsified trading records by manipulating customer trading data such that the daily trading results snapshots sent to customers were nearly always positive. Traders Domain FX LTD also manipulated trading data to eliminate purported trading losses. And, when customers observed trading losses in their accounts and raised their concerns, Traders Domain FX LTD falsely claimed (directly or through Sponsors) that such losses were "system errors" or the result of "slippage."

35.     When Traders Domain FX LTD began experiencing "liquidity problems" in August 2022, Traders Domain FX LTD lied to customers about the purported reasons for delayed withdrawals and made false assurances that withdrawals would eventually be processed. Indeed, Traders Domain FX LTD lacked the funds to repay its customers because such funds had been misappropriated and not traded as purported, and the Traders Domain FX LTD fraudulent scheme was on the brink of collapse.

36.     Traders Domain FX LTD misappropriated customer funds by directing customers to deposit funds into third-party bank accounts which were not controlled by Traders Domain FX LTD or to payment processors contracted by Traders Domain FX LTD who acted at the direction of Traders Domain FX LTD. Traders Domain FX LTD also failed to use at least some customer funds to trade XAU/USD and charged commissions on purported trading profits that did not exist. Traders Domain FX LTD also misappropriated customer funds by failing to return customer funds despite repeated attempts by thousands of customers to access and/or liquidate their accounts.

37.     Traders Domain FX LTD also misappropriated customer funds by using new customer deposits to make Ponzi-style payments to fund pending withdrawals for certain customers.

### The Sponsor Fraudulent Schemes

#### Algo Capital

38.     Algo Capital, LLC ("Algo") and Algo FX Capital Advisor, LLC n/k/a Quant5 Advisor, LLC ("Algo FX") operated from their principal places of business in Miami, Florida.

39.     Robert Collazo, Jr. was the President of Algo and manager and owner of Algo FX.  Juan "JJ" Herman was the Vice President of Algo and a manager and owner of Algo FX. At all material times, Mr. Collazo and Mr. Herman were controlling persons of Algo and Algo FX.

40.     John Fortini was the Vice President and CFO Portfolio Management of Algo and Algo FX. Stephen Likos was a salesperson for Algo and Algo FX.

41.     From at least November 2019 to October 2024 (the "Relevant Algo Period"),[1] the Algo stakeholders made false and misleading statements to current and prospective customers regarding Algo's trading operations, how customer funds were being utilized, and where customer funds were located. And, Algo stakeholders misappropriated and commingled customer funds.

42.     Algo was a Traders Domain Sponsor and fraudulently solicited at least $39 million from at least 242 customers for the purposes of trading leveraged or margined XAU/USD by making material misrepresentations and omissions to prospective and actual investors.

43.     During the Relevant Algo Period, Algo stakeholders executed agreements with customers providing licenses to use Algo's "proprietary algorithmic trading software" in exchange for up to 50% of customer trading profits; however, Algo was operating as a fraudulent scheme, and Algo stopped using its own proprietary algorithm and directed customer funds to Traders Domain.

44.     And, instead of sending customer funds to Traders Domain, they directed customers to deposit funds into bank accounts controlled by Collazo and Herman using certain of the funds for personal and non-trading related purposes.

---

[1] While the CFTC's Complaint concerns the period of October 2021 through October 2024, the Receiver's investigation reflects that Algo was operating as a Ponzi scheme and/or other fraudulent scheme from as early as November 2019.

45.     Algo stakeholders fraudulently misled customers into believing that Algo had control of their funds when Traders Domain did. Algo customers were directed to submit withdrawal requests directly to Algo, and Algo, in turn, submitted withdrawal requests to Traders Domain without copying or notifying its customers. Traders Domain failed to return funds, and by January 2023, the backlog of outstanding Algo customer withdrawal requests amounted to approximately $27 million.

46.     During the Relevant Algo Period, Algo customers deposited no less than $32 million into the accounts controlled by Collazo and Herman, but most customer withdrawals could not be paid because Algo, Collazo, and Herman used most of the funds to pay themselves and to make Ponzi-style payments to certain customers.

### Findings of Fraud in the SRO

47.     As a result of the fraudulent conduct outlined above, the CFTC commenced the CFTC Action against the Receivership Defendants, which resulted in the entry of preliminary findings that the Receivership Defendants Santi, Rice, Beltran, Sims, Fortini, Likos, Collazo, and Buggs likely participated in a fraudulent commodities scheme. *See* CFTC Action at ECF Nos. 38, 40-42, 48, 49, 53, 131, and 144. And the Court in the CFTC Action entered an Order of Preliminary Injunction as to Safranko, Negus-Romvari, and Herman. *See* CFTC Action at ECF No. 158.

### The Insolvency of the Receivership Defendants

48.     As a result of operating a Ponzi scheme, the Receivership Defendants were insolvent, undercapitalized, and operating at a loss. During all relevant times,

the Receivership Defendants did not have sufficient assets to pay their debts to customers and creditors as those debts became due.

### Transfers to Defendants

49.     During the Relevant Period, the Receivership Defendants made at least two transfers to Burton for a total of $59,840.00 (collectively, the "Burton Transfers"). *See* Summary of Burton Transfers, attached as **Exhibit A**.

50.     During the Relevant Period, Calderin made at least one transfer to the Receivership Defendants for a total of $30,000.00, and the Receivership Defendants made at least eleven transfers to Calderin for a total of $109,056.71, for a net gain to Calderin of $79,056.71 (collectively, the "Calderin Transfers"). *See* Summary of Calderin Transfers, attached as **Exhibit B**.

51.     During the Relevant Period, the Receivership Defendants made at least three transfers to Jones-Evans for a total of $77,361.95 (collectively, the "Jones-Evans Transfers").  *See* Summary of Jones-Evans Transfers, attached as **Exhibit C**.

52.     During the Relevant Period, Romano made at least two transfers to the Receivership Defendants for a total of $550,000.00, and the Receivership Defendants made at least seventeen transfers to Romano as Trustee for the AR Family Spendthrift Trust, and one transfer to Romano as Trustee for the Romano Family Spendthrift Trust, for a total of $1,914,000.00, for a net transfer of $1,364,000.00 (collectively, the "Romano Cash Transfers"). *See* Summary of Romano Cash Transfers, attached as **Exhibit D**.

53.     Upon information and belief, Romano was a beneficiary of, and/or subsequent transferee of, the Romano Cash Transfers.

54.     Also, during the Relevant Period, the Receivership Defendants made at least twenty-seven cryptocurrency transfers to Romano, for a total of $3,227,737.79 (collectively, the "Romano Crypto Transfers" and together with the Romano Cash Transfers, the "Romano Transfers"). *See* Summary of Romano Crypto Transfers, attached as **Exhibit E**.[2]

55.     The Burton Transfers, Calderin Transfers, Jones-Evans Transfers, and Romano Cash Transfers originated from the Receivership Defendants' bank accounts located in Florida.

56.     The Burton Transfers, Calderin Transfers, Jones-Evans Transfers, and Romano Transfers are collectively referred to as the "Transfers."

57.     The funds comprising the Transfers to Defendants were funds that the Receivership Defendants fraudulently obtained from customers in the form of commissions, fees and/or other payments in connection with the scheme described above.

58.     Defendants received the Transfers without providing reasonably equivalent value to the Receivership Defendants in exchange for the Transfers.

---

[2] **Exhibit E** identifies two distinct addresses which correspond to cryptocurrency wallets which were solely owned and controlled by Romano:

    (1) 0x1e62df860149c0d524b6844e7f6db8c92a91f877; and
    (2) 0x3d6b7846f08f17ac00f82502dc9b771ff95c2206.

59.     When the Transfers were made to Defendants, the Receivership Defendants intended to incur, or believed, or reasonably should have believed that they would incur, debts beyond their ability to pay them as they became due.

60.     Thus, the Receivership Defendants had the actual intent to delay, hinder, or defraud investors and creditors, and made the Transfers to delay, hinder, or defraud investors and creditors.

61.     The Receivership Defendants, and thereby the Receivership Estate, have been damaged significantly as a direct and proximate result of the Transfers made to Defendants as alleged above. Such damages include, but are not limited to, losses due to the dissipation of customer funds for which no reasonably equivalent value was provided and other and further compensatory and consequential damages.

62.     Accordingly, the Receiver brings the instant action in order to collect monies that were improperly transferred, dissipated, misappropriated, or lost from the Receivership Defendants as a result of the fraudulent transfers to, and unjust enrichment of, Defendants.

## CLAIMS FOR RELIEF

### COUNT I

### AGAINST ALL DEFENDANTS

**(Fraudulent Transfer under § 726.105(1)(a), Fla. Stat.,
Florida Uniform Fraudulent Transfer Act)**

63.     Plaintiff repeats, re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 62 of this Complaint as if fully set forth herein.

64.     This is a claim to avoid and recover a fraudulent transfer pursuant to section 726.105(a)(1), Florida Statutes.

65.     As detailed above, the Receivership Defendants made the Transfers to the Defendants.

66.     Defendants received the Transfers from the Receivership Defendants without providing reasonably equivalent value in exchange for the Transfers.

67.     At the time that the Receivership Defendants made the Transfers, they were operating a fraudulent and/or Ponzi scheme, were insolvent, and were engaged in a business or transaction for which their remaining assets were unreasonably small in relation to the business or transaction.

68.     When the Receivership Defendants made the Transfers to Defendants, the Receivership Defendants intended to incur, or believed, or reasonably should have believed that they would incur, debts beyond their ability to pay them as they became due.

69.     The Receivership Defendants made the Transfers in furtherance of their fraudulent and/or Ponzi scheme.

70.     At the time that the Receivership Defendants made the Transfers, they removed and/or concealed assets of the Receivership Defendants from the reach of their investors and/or creditors.

71.     The Receivership Defendants made the Transfers at the direction of their principals, as a result of their fraudulent domination, adverse interest in, and

17

control of Receivership Defendants and as part of their continued breaches of their fiduciary duties to Receivership Defendants.

72.     Receivership Defendants had the actual intent to delay, hinder, or defraud creditors, and made the Transfers to delay, hinder, or defraud creditors. Consequently, the Transfers were inherently fraudulent pursuant to section 726.105(1)(a), Florida Statutes.

73.     Because the Transfers were fraudulent under Florida Statutes Section 726.105(1)(a), the Receiver may avoid the Transfers pursuant to section 726.109(2).

74.     As a direct and proximate result of the Receivership Defendants' fraudulent Transfers to Defendants, the Receivership Estate has been diminished in the amount of the Transfers, and the remaining assets of the Receivership Estate are insufficient to pay the Receivership Estate's debts and liabilities, including, most notably, the claims of the customers and creditors who were defrauded by the Receivership Defendants and their principals.

WHEREFORE, Plaintiff, Kelly M. Crawford, as the Receiver, respectfully requests that the Court enter judgment against Defendants:  (1) determining that the Transfers from the Receivership Defendants to Defendants in the amount of each Transfer were fraudulent and avoiding those Transfers; (2) entering a money judgment against Defendants in the full amount of the Transfers received by each Defendant, and, if necessary, imposing a constructive trust and/or equitable lien on the funds or other assets traceable to such Transfers; (3) awarding Plaintiff damages, costs, and interest; and (4) granting such other and further relief as may be just and proper.

## COUNT II

### AGAINST ALL DEFENDANTS

**(Fraudulent Transfer under § 726.105(1)(b), Fla. Stat.,
Florida Uniform Fraudulent Transfer Act)**

75.     Plaintiff repeats, re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 62 of this Complaint as if fully set forth herein.

76.     This is a claim to avoid and recover a fraudulent transfer pursuant to section 726.105(1)(b), Florida Statutes.

77.     As detailed above, the Receivership Defendants made the Transfers to Defendants.

78.     Defendants received the Transfers from the Receivership Defendants without providing reasonably equivalent value in exchange for the Transfers.

79.     The Receivership Defendants did not receive reasonably equivalent value in exchange for the Transfers to Defendants, as detailed above.

80.     At the time that the Receivership Defendants made the Transfers to Defendants, the Receivership Defendants were operating a fraudulent and/or Ponzi scheme, were insolvent, and were engaged in a business or transaction for which their remaining assets were unreasonably small in relation to the business or transaction.

81.     The Receivership Defendants made the Transfers in furtherance of their fraudulent and/or Ponzi scheme.

82.     At the time that the Receivership Defendants made the Transfers, they removed and/or concealed assets of the Receivership Defendants from the reach of their investors and/or creditors.

83.     The Receivership Defendants made the Transfers at the direction of their principals, as a result of their fraudulent domination, adverse interest in, and control of Receivership Defendants and as part of their continued breaches of their fiduciary duties to Receivership Defendants.

84.     When the Receivership Defendants made the Transfers to Defendants, the Receivership Defendants intended to incur, or believed, or reasonably should have believed that they would incur, debts beyond their ability to pay them as they became due.

85.     Because the Transfers were fraudulent under section 726.105(1)(b), Florida Statutes, the Receiver may avoid the Transfers pursuant to section 726.109(2).

86.     As a direct and proximate result of Receivership Defendants' fraudulent Transfers to Defendants, the Receivership Estate has been diminished in the amount of the Transfers, and the remaining assets of the Receivership Estate are insufficient to pay the Receivership Estate's debts and liabilities, including, most notably, the claims of the customers and creditors who were defrauded by the Receivership Defendants and their principals.

WHEREFORE, Plaintiff, Kelly M. Crawford, as the Receiver, respectfully requests that the Court enter judgment against Defendants:  (1) determining that the

Transfers from the Receivership Defendants to Defendants in the amount of each Transfer were fraudulent and avoiding those Transfers; (2) entering a money judgment against Defendants in the full amount of the Transfers received by each Defendant, and, if necessary, imposing a constructive trust and/or equitable lien on the funds or other assets traceable to such Transfers; (3) awarding Plaintiff damages, costs, and interest; and (4) granting such other and further relief as may be just and proper.

### COUNT III

### AGAINST ALL DEFENDANTS

**(Fraudulent Transfer under § 726.106(1), Fla. Stat.,
Florida Uniform Fraudulent Transfer Act)**

87.     Plaintiff repeats, re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 62 of this Complaint as if fully set forth herein.

88.     This is a claim to avoid and recover fraudulent transfers, pursuant to section 726.106(1), Florida Statutes.

89.     As detailed above, the Receivership Defendants made the Transfers to Defendants.

90.     Defendants received the Transfers from the Receivership Defendants without providing reasonably equivalent value in exchange for the Transfers.

91.     The Receivership Defendants did not receive reasonably equivalent value in exchange for the Transfers, as detailed above. Indeed, the Defendants made

no payments and provided no other value to the Receivership Defendants or the Receivership Estate related to the Transfers.

92.    The Receivership Defendants had creditors whose claims arose before the Receivership Defendants made the Transfers to Defendants.

93.    When Receivership Defendants made the Transfers to Defendants, the assets remaining in Receivership Defendants' business were unreasonably small in relation to the business or transaction.

94.    When the Receivership Defendants made the Transfers to Defendants, the Receivership Defendants were operating a fraudulent and/or Ponzi scheme and thus intended to incur, or believed, or reasonably should have believed that they would incur, debts beyond their ability to pay them as they became due.

95.    Because the Transfers are fraudulent under section 726.106(1), Florida Statutes, the Receiver may avoid the Transfers pursuant to section 726.109(2).

96.    As a direct and proximate result of Receivership Defendants' fraudulent Transfers to Defendants, the Receivership Estate has been diminished in the amount of the Transfers,  and the remaining assets of the Receivership Estate are insufficient to pay the Receivership Estate's debts and liabilities, including, most notably, the claims of the customers and creditors who were defrauded by the Receivership Defendants and their principals.

WHEREFORE, Plaintiff, Kelly M. Crawford, as the Receiver, respectfully requests that the Court enter judgment against Defendants:  (1) determining that the Transfers from Receivership Defendants to Defendants in the amount of each Transfer were fraudulent and avoiding those Transfers; (2) entering a money

judgment against Defendants in the full amount of the Transfers received by each Defendant, and, if necessary, imposing a constructive trust and/or equitable lien on the funds or other assets traceable to such Transfers; (3) awarding Plaintiff damages, costs, and interest; and (4) granting such other and further relief as may be just and proper.

## COUNT IV

### AGAINST ALL DEFENDANTS

### (Unjust Enrichment as to the Transfers)

97.   Plaintiff repeats and re-alleges and incorporate by reference the allegations set forth in paragraphs 1 through 62 of this Complaint as if fully set forth herein.

98.   The Receivership Defendants conferred a benefit on Defendants when they made the Transfers to Defendants in the amount of the Transfers, all of which were derived from customers of the Receivership Defendants' fraudulent scheme.

99.   The Defendants had knowledge of the benefit they received from the Receivership Defendants as a result of the Transfers and voluntarily accepted and retained the benefit conferred.

100.   It is inherently unfair and inequitable that the funds of customers defrauded in the Receivership Defendants' fraudulent scheme are retained by and used to personally benefit Defendants, rather than being returned to the Receivership Estate for the benefit of all the defrauded customers.

101.   As a direct and proximate result of Defendants' retention of the Transfers they received from the Receivership Defendants, the Receivership Estate

has been diminished, and, under the circumstances, equity dictates that Defendants should return the funds they received from Receivership Defendants, and any assets they may have acquired with those funds, to the Receiver for the benefit of all of the defrauded investors.

WHEREFORE, Plaintiff, Kelly M. Crawford, as Receiver, respectfully requests the Court enter judgment against Defendants: (1) determining that Defendants were unjustly enriched by virtue of their receipt of the Transfers from the Receivership Defendants; (2) entering a money judgment against Defendants, in the full amount of the Transfers, and, if necessary, imposing a constructive trust and/or equitable lien on the funds or other assets traceable to such Transfers; (3) awarding Plaintiff damages, costs, and interest; and (4) granting such other and further relief as may be just and proper.

Respectfully submitted,

*/s/ Vincenzo Lamonica*
Vincenzo Lamonica
Florida Bar No. 1058073
Email: vlamonica@dvcattorneys.com
Russell Landy
Florida Bar No. 44417
Email: rlandy@dvllp.com
DAMIAN | VALORI | CULMO
*Counsel for Plaintiff, Kelly M. Crawford*
1000 Brickell Avenue, Suite 1020
Miami, Florida 33131
Telephone: (305) 371-3960
Facsimile: (305) 371-3965